APPEAL,CLOSED,JURY,TYPE−H

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:15−cv−01604−BAH</u>
### *Internal Use Only*

MAYORGA v. AYERS
Assigned to: Chief Judge Beryl A. Howell
Demand: $300,000
Cause: 42:1983 Civil Rights (Employment Discrimination)

Date Filed: 10/01/2015
Date Terminated: 12/08/2017
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**JAVIER A. MAYORGA**                    represented by    **Ellen K. Renaud**
SWICK & SHAPIRO, P.C.
1101 15th Street, NW
Suite 205
Washington, DC 20005
(202) 842−0300
Fax: (202) 842−1418
Email: ekrenaud@swickandshapiro.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**STEPHEN T. AYERS**                     represented by    **Johnny Hillary Walker , III**
*Architect of the Capitol*                                 U.S. ATTORNEY'S OFFICE
Civil Division
555 Fourth Street, NW
Washington, DC 20530
(202) 252−2575
Fax: (202) 252−2599
Email: johnny.walker@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Cuong Truong**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252−2524
Fax: (202) 252−2599
Email: john.truong@usdoj.gov
*TERMINATED: 02/11/2016*

| Date Filed | # | Page | Docket Text |
|------------|---|------|-------------|
|            |   |      |             |

| 10/01/2015 | 1 | | COMPLAINT against STEPHEN T. AYERS with Jury Demand ( Filing fee $ 400 receipt number 0090−4264069) filed by JAVIER A. MAYORGA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Stephen Ayers, # 3 Summons Ronald Machen, Jr., # 4 Summons Loretta Lynch)(Renaud, Ellen) (Entered: 10/01/2015) |
| 10/01/2015 | | | Case Assigned to Judge Ketanji Brown Jackson. (md) (Entered: 10/02/2015) |
| 10/05/2015 | 2 | | SUMMONS (3) Issued Electronically as to STEPHEN T. AYERS, U.S. Attorney and U.S. Attorney General (jf) (Entered: 10/05/2015) |
| 10/30/2015 | 3 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. STEPHEN T. AYERS served on 10/13/2015 (Renaud, Ellen) (Entered: 10/30/2015) |
| 10/30/2015 | 4 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 10/7/2015. Answer due for ALL FEDERAL DEFENDANTS by 12/6/2015. (Renaud, Ellen) (Entered: 10/30/2015) |
| 10/30/2015 | 5 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 10/13/2015. (Renaud, Ellen) (Entered: 10/30/2015) |
| 12/02/2015 | 6 | | Consent MOTION for Extension of Time to *Respond to Complaint* by STEPHEN T. AYERS (Truong, John) (Entered: 12/02/2015) |
| 12/03/2015 | | | MINUTE ORDER granting, for good cause shown, 6 Consent Motion for Extension of Time to Answer. It is hereby ORDERED that Defendant shall answer or otherwise respond to the complaint by 1/8/2016. Signed by Judge Ketanji Brown Jackson on 12/3/2015. (lckbj1) (Entered: 12/03/2015) |
| 12/04/2015 | 7 | | GENERAL ORDER AND GUIDELINES FOR CIVIL CASES BEFORE JUDGE KETANJI BROWN JACKSON. The Court will hold the parties and counsel responsible for following these directives, and parties and counsel should pay particular attention to the Courts instructions for briefing motions. Failure to adhere to this Order may, when appropriate, result the imposition of sanctions and/or sua sponte denial of non−conforming motions. Signed by Judge Ketanji Brown Jackson on 12/4/2015. (lckbj1) (Entered: 12/04/2015) |
| 01/07/2016 | 8 | | ANSWER to Complaint by STEPHEN T. AYERS.(Truong, John) (Entered: 01/07/2016) |
| 01/08/2016 | 9 | | |

| | | | |
|---|---|---|---|
| | | | ORDER setting Initial Scheduling Conference for 2/23/2016 at 02:30 PM in Courtroom 17 before Judge Ketanji Brown Jackson. See attached Order for details. Signed by Judge Ketanji Brown Jackson on 1/8/2016. (lckbj1) (Entered: 01/08/2016) |
| 01/08/2016 | 10 | | Consent MOTION for Order *to Reschedule Initial Conference* by JAVIER A. MAYORGA (Renaud, Ellen) (Entered: 01/08/2016) |
| 01/13/2016 | | | MINUTE ORDER granting 10 Consent Motion to Reschedule Initial Conference. It is hereby ORDERED that the Initial Scheduling Conference currently set for 2/23/2016 is VACATED and RESET for 3/3/2016 at 02:45 PM in Courtroom 17 before Judge Ketanji Brown Jackson. Signed by Judge Ketanji Brown Jackson on 1/13/2016. (lckbj1) (Entered: 01/13/2016) |
| 02/11/2016 | 11 | | NOTICE OF SUBSTITUTION OF COUNSEL by Johnny Hillary Walker, III on behalf of STEPHEN T. AYERS Substituting for attorney John C. Truong (Walker, Johnny) (Entered: 02/11/2016) |
| 02/16/2016 | 12 | | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order)(Walker, Johnny) (Entered: 02/16/2016) |
| 03/03/2016 | | | Minute Entry for proceedings held before Judge Ketanji Brown Jackson: Scheduling Conference held on 3/3/2016. Initial Disclosure due by 4/4/2016. Plaintiff Rule 26(a)(2) due by 5/2/2016. Defendant Rule 26(a)(2) due by 6/1/2016. Discovery due by 7/1/2016. Status Conference set for 7/19/2016 at 2:30 PM in Courtroom 17 before Judge Ketanji Brown Jackson. (Court Reporter Barbara DeVico) (gdf) (Entered: 03/03/2016) |
| 03/03/2016 | 13 | | SCHEDULING ORDER: Plaintiff Rule 26(a)(1) due by 4/4/2016. Plaintiff Rule 26(a)(2) due by 5/2/2016. Defendant Rule 26(a)(2) due by 6/1/2016. Discovery to be completed by 7/1/2016. Dispositive Motions due by 8/30/2016. Response to Dispositive Motions due by 9/29/2016. Reply to Dispositive Motions due by 10/13/2016. Status Conference set for 7/19/2016 at 02:30 PM in Courtroom 17 before Judge Ketanji Brown Jackson. See attached order for additional details. Signed by Judge Ketanji Brown Jackson on March 3, 2016. (lckbj3, ) (Entered: 03/03/2016) |
| 03/07/2016 | 14 | | Joint MOTION for Protective Order by STEPHEN T. AYERS (Attachments: # 1 Text of Proposed Order)(Walker, Johnny) (Entered: 03/07/2016) |
| 03/10/2016 | 15 | | ORDER granting 14 Motion for Protective Order. Signed by Judge Ketanji Brown Jackson on 03/10/2016. (lckbj1) (Entered: 03/10/2016) |

| 06/10/2016 | | | MINUTE ORDER. It is hereby ORDERED that the schedule in this case is amended as follows: the Status Conference set for 7/19/2016 is VACATED and RESET for 7/28/16 at 10:00 AM. The dispositive motions schedule is revised as follows: dispositive motions are due by 9/6/2016. Responses to dispositive motions are due by 10/6/2016. Replies to dispositive motions are due by 10/20/16. Signed by Judge Ketanji Brown Jackson on June 10, 2016. (lckbj3, ) (Entered: 06/10/2016) |
|---|---|---|---|
| 07/28/2016 | | | Minute Entry for proceedings held before Judge Ketanji Brown Jackson: Status Conference (Post Discovery) held on 7/28/2016. Dispositive Motions due 9/06/2016; Oppositions are due 10/06/2016; Replies are due 10/20/2016 (Court Reporter Barbara DeVico) (nbn) (Entered: 07/28/2016) |
| 09/06/2016 | <u>16</u> | | MOTION for Summary Judgment by STEPHEN T. AYERS (Attachments: # <u>1</u> Statement of Facts, # <u>2</u> Memorandum in Support, # <u>3</u> Exhibit 1: Mayorga Dep. Tr. (excerpts), # <u>4</u> Exhibit 2: Vacancy Announcement, # <u>5</u> Exhibit 3: Certificates of Eligible Candidates, # <u>6</u> Exhibit 4: Bieber Dep. Tr. (excerpts), # <u>7</u> Exhibit 5: Wallace Dep. Tr. (excerpts), # <u>8</u> Exhibit 6: Watson Dep. Tr. (excerpts), # <u>9</u> Exhibit 7: Bieber Notes re Mayorga Interview, # <u>10</u> Exhibit 8: Williams Dep. Tr. (excerpts), # <u>11</u> Exhibit 9: Coulter Dep. Tr. (excerpts), # <u>12</u> Exhibit 10: Helmann Dep. Tr. (excerpts), # <u>13</u> Exhibit 11: Helmann Notes re Interviews, # <u>14</u> Exhibit 12: Franz Dep. Tr. (excerpts), # <u>15</u> Exhibit 13: Williams Resume, # <u>16</u> Exhibit 14: Bieber Notes re Williams Interview, # <u>17</u> Exhibit 15: Wallace Notes re Williams Interview, # <u>18</u> Exhibit 16: Watson Notes re Williams Interview, # <u>19</u> Exhibit 17: Coulter Resume, # <u>20</u> Exhibit 18: Bieber Notes re Coulter Interview, # <u>21</u> Exhibit 19: Wallace Notes re Coulter Interview, # <u>22</u> Exhibit 20: Watson Notes re Coulter Interview, # <u>23</u> Exhibit 21: Mayorga Resume, # <u>24</u> Exhibit 22: Wallace Notes re Mayorga Interview, # <u>25</u> Exhibit 23: Watson Notes re Mayorga Interview, # <u>26</u> Exhibit 24: Office of Compliance Certification, # <u>27</u> Exhibit 25: Plaintiff's Amended Responses to Defendant's Interrogatories, # <u>28</u> Text of Proposed Order)(Walker, Johnny) (Entered: 09/06/2016) |
| 10/06/2016 | <u>17</u> | | Consent MOTION for Extension of Time to *File Plaintiff's Opposition to Summary Judgment* by JAVIER A. MAYORGA (Renaud, Ellen) (Entered: 10/06/2016) |
| 10/13/2016 | | | MINUTE ORDER granting, for good cause shown, <u>17</u> Consent Motion for Extension of Time to File Plaintiff's Opposition to Summary Judgment. It is hereby ORDERED that Plaintiff opposition to Defendant's <u>16</u> Motion for Summary Judgment is due on or before 10/13/2016. Any further requests for extensions of time must comply with <u>7</u> the Court's General Order and Guidelines for Civil Cases. |

| | | | |
|---|---|---|---|
| | | | Counsel is specifically directed to Section 5 of the Appendix to the General Order and Guidelines. Signed by Judge Ketanji Brown Jackson on 10/13/2016. (lckbj1) (Entered: 10/13/2016) |
| 10/13/2016 | | | MINUTE ORDER. It is hereby ORDERED that Defendant's reply in further support of its motions for summary judgment is due on or before 10/27/2016. Signed by Judge Ketanji Brown Jackson on 10/13/2016. (lckbj1) (Entered: 10/13/2016) |
| 10/13/2016 | 18 | | Memorandum in opposition to re 16 MOTION for Summary Judgment filed by JAVIER A. MAYORGA. (Attachments: # 1 Bieber Depo, # 2 Mayorga Depo, # 3 Bieber Evaluation of Candidates, # 4 Williams Depo, # 5 Wallace Depo, # 6 Watson Depo, # 7 Watson notes on Mayorga interview, # 8 Molina Declaration, # 9 Mayorga Declaration, # 10 Statement of Facts Dispute of Material Facts)(Renaud, Ellen) (Entered: 10/13/2016) |
| 10/25/2016 | 19 | | NOTICE of Filing Declaration by JAVIER A. MAYORGA re 18 Memorandum in Opposition, (Attachments: # 1 Declaration)(Renaud, Ellen) (Entered: 10/25/2016) |
| 10/27/2016 | 20 | | REPLY to opposition to motion re 16 MOTION for Summary Judgment filed by STEPHEN T. AYERS. (Attachments: # 1 Exhibit 25: Bieber Dep. Tr. (reply excerpts), # 2 Exhibit 26: Bieber Decl.)(Walker, Johnny) (Entered: 10/27/2016) |
| 10/24/2017 | 21 | | Case directly reassigned to Chief Judge Beryl A. Howell by consent. Judge Ketanji Brown Jackson is no longer assigned to the case. (ztnr) (Entered: 10/25/2017) |
| 12/07/2017 | 22 | 9 | ORDER GRANTING the defendant's 16 Motion for Summary Judgment. See Order for further details. The Clerk is directed to close this case. Signed by Chief Judge Beryl A. Howell on December 7, 2017. (lcbah4) (Entered: 12/07/2017) |
| 12/07/2017 | 23 | 10 | MEMORANDUM OPINION regarding the defendant's 16 Motion for Summary Judgment. Signed by Chief Judge Beryl A. Howell on December 7, 2017. (lcbah4) (Entered: 12/07/2017) |
| 12/29/2017 | 24 | | MOTION for Reconsideration re 22 Order on Motion for Summary Judgment, 23 Memorandum & Opinion by JAVIER A. MAYORGA (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Renaud, Ellen) (Entered: 12/29/2017) |
| 01/12/2018 | 25 | | Memorandum in opposition to re 24 MOTION for Reconsideration re 22 Order on Motion for Summary Judgment, 23 Memorandum & Opinion filed by STEPHEN T. AYERS. (Walker, Johnny) (Entered: 01/12/2018) |
| 01/30/2018 | 26 | 43 | |

| | | | |
|---|---|---|---|
| | | | MEMORANDUM and ORDER DENYING the plaintiff's <u>24</u> Motion for Reconsideration of Summary Judgment. See Order for further details. Signed by Chief Judge Beryl A. Howell on January 30, 2018. (lcbah4) (Entered: 01/30/2018) |
| 01/31/2018 | <u>27</u> | 7 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to <u>22</u> Order on Motion for Summary Judgment, <u>26</u> Order on Motion for Reconsideration, <u>23</u> Memorandum & Opinion by JAVIER A. MAYORGA. Filing fee $ 505, receipt number 0090−5312524. Fee Status: Fee Paid. Parties have been notified. (Renaud, Ellen) (Entered: 01/31/2018) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| **JAVIER A. MAYORGA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 15 – 01604-BAH** |
| | ) | |
| **STEPHEN T. AYERS,** | ) | |
| **Architect of the Capitol,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### NOTICE OF APPEAL

PLEASE TAKE NOTICE that Plaintiff Javier A. Mayorga hereby appeals to the United States Court of Appeals for the District of Columbia Circuit Memorandum and Order entered on January 30, 2018, denying the plaintiff's Motion for Reconsideration of Summary Judgment, and the Memorandum Opinion and Order entered on December 7, 2017, granting judgment in favor of defendant and against the plaintiff, by Beryl A. Howell, United States District Judge for the District of Columbia.

Respectfully submitted,

 */s/ Ellen K. Renaud*
Ellen K. Renaud
D.C. Bar No. 479376
SWICK & SHAPIRO, P.C.
1101 15th Street, N.W.
Suite 205
Washington, D.C. 20005
Tel. (202) 842-0300
Fax (202) 842-1418
Email -ekrenaud@swickandshapiro.com

Attorney for Plaintiff

## <u>CERTIFICATE  OF  SERVICE</u>

I HEREBY CERTIFY THAT the foregoing Notice of Appeal has been served upon defendant by CM/ECF electronic notification on January 31, 2018 to his attorney of record, Johnny H. Walker, Assistant U.S. Attorney, Civil Division, 555 Fourth Street, N.W. Washington, DC 20530.

*/s/ Ellen K. Renaud*
Ellen K. Renaud

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JAVIER A. MAYORGA,

        Plaintiff,

        v.

STEPHEN T. AYERS,
ARCHITECT OF THE CAPITOL

        Defendant.

Civil Action No. 15-1604 (BAH)

Chief Judge Beryl A. Howell

## <u>ORDER</u>

Upon consideration of the defendant's Motion for Summary Judgment, ECF No. 16, the memoranda submitted in support and opposition, the exhibits attached thereto, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the defendant's Motion for Summary Judgment is GRANTED.

**SO ORDERED.**

Date: December 7, 2017

*This is a final and appealable order.*

_____
BERYL A. HOWELL
Chief Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAVIER A. MAYORGA, | |
| Plaintiff, | Civil Action No. 15-cv-1604 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| STEPHEN T. AYERS, ARCHITECT OF THE CAPITOL | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Javier A. Mayorga, a Hispanic man of Nicaraguan origin currently employed as an Electronic Industrial Controls Mechanic in the Office of the Architect of the Capitol ("AOC"), initiated this action against defendant Stephen T. Ayers, the Architect of the Capitol, in his official capacity, alleging "employment discrimination based on his race and national origin" in violation of Title IV of the Congressional Accountability Act of 1995 ("CAA"), 2 U.S.C. § 1311, 1317(a)(1), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Complaint, ECF No. 1 ("Compl.") ¶ 1.[1]  In the summer of 2014, the plaintiff applied for a promotion within AOC, but two Caucasian individuals were selected instead of him.  The plaintiff claims that although he was the most qualified applicant for this position, he was not selected because of his race and national origin.  Compl. ¶ 8.  After the plaintiff's request for counseling with AOC's Office of Compliance and his subsequent request for mediation ended without resolution, he filed this lawsuit.  Pending before the Court is the defendant's motion for summary judgment, contending that AOC had legitimate,

---

[1]    The CAA makes Title VII of the Civil Rights Act applicable to the legislative branch of the federal government.  *See* 2 U.S.C. § 1302(a)(2).

1

nondiscriminatory reasons for selecting two individuals instead of the plaintiff and that the plaintiff cannot show that AOC's reasons for this selection were pretext for discrimination. For the reasons explained below, the defendant's motion is granted.

## I.   BACKGROUND

### A.   Factual Background

The plaintiff moved to the United States from Nicaragua at age twenty-five to avoid political turmoil.  Def.'s Mot. Summ. J. ("Def.'s Mot."), Ex. 2, Deposition of Javier Mayorga ("Pl.'s Dep.") at 7–8, ECF No. 16-3.[2]  In Nicaragua, he completed high school and some university coursework in electrical engineering and also worked for a refrigeration company.  *Id.* at 6–8.  After coming to the United States, the plaintiff worked in heating and air conditioning services for nearly nine years at Permanent Solutions Industries before leaving his job to attend Stratford University, where he earned an associate's degree in "Network."  Pl.'s Dep. at 10–13, ECF No. 18-2; Def.'s Mot., Ex. 21, Resume of Javier A. Mayorga ("Pl.'s Resume") at 4, ECF No. 16-23.  While taking classes at Stratford, the plaintiff worked for the appliance company Maytag, first as a service technician and then as a store manager.  Pl.'s Dep. at 13, ECF No. 18-2; Pl.'s Resume at 3.  After finishing his degree in 2003, he worked as a service technician for TK Services, Inc., for five months, where he was responsible for installing and troubleshooting the heating, ventilation, and air conditioning ("HVAC") equipment.  Pl.'s Dep. at 17, ECF No. 18-2; Pl.'s Resume at 5.  He then took a job at Advanced Power Control, where he worked for two and a half years as a service technician installing and troubleshooting HVAC equipment,

---

[2]      The parties have submitted different excerpts from the same depositions as exhibits to both moving and responsive papers and, for ease of review, citations to the depositions will identify the docket number where the referenced deposition section may be found rather than the exhibit number.

communications equipment, transformers, and pressure sensors, among other responsibilities. Pl.'s Resume at 3.

In late 2007 the plaintiff joined AOC, an independent agency within the legislative branch responsible for maintaining and operating government buildings and landmarks including the United States Capitol, the Capitol Visitor Center, the Supreme Court, and the United States Botanic Garden.  Def.'s Mot., Ex. 2, Vacancy Announcement ("Vacancy Announcement") at 2, ECF No. 16-4.  The plaintiff was hired as an Electronic Industrial Controls Mechanic at the Wage Grade ("WG") 12 level, earning approximately $32 per hour.  Compl. ¶¶ 3, 6; Pl.'s Dep. at 26, ECF No. 18-2.  In this position, the plaintiff primarily works at the Capitol Visitor Center and is responsible for working on and maintaining the building's network operations and building automation system (BAS), which includes HVAC, plumbing, lighting, elevators, electrical monitoring, generators, utility metering, carbon monoxide and nitrogen oxide monitoring, and water fountains.  Pl.'s Dep. at 30–32, ECF No. 18-2; Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply"), Ex. 26, Declaration of Scott Bieber ("Bieber Decl.") ¶ 3, ECF No. 20-2.  The plaintiff's supervisors rated his performance as "Outstanding" on his two prior performance reviews, and he has received numerous awards over the past several years.  Compl. ¶ 6.

In 2014, the plaintiff responded to a vacancy announcement advertising multiple openings for an Electronics Technician in the Energy Management Control Systems ("EMCS") Branch of the Planning and Project Management Office within AOC, listed at the GS-10 and GS-11 salary levels.  Def.'s Mot., Ex. 1, Def.'s Statement of Material Facts ("Def.'s SMF") ¶ 4

(undisputed); Vacancy Announcement at 2–3.[3]  The EMCS Branch is a central office that performs maintenance and operations services for the various jurisdictions within the AOC's purview, including the House Superintendent's Office, the Senate Superintendent's Office, and the Capitol Superintendent's Office.  Def.'s SMF ¶ 4 (undisputed).  The people hired for the vacancies would be responsible for installing, maintaining, troubleshooting, diagnosing, programming, and operating the AOC's building automation system network ("BASnet"), direct digital control ("DDC") systems, new networks in the buildings, Ethernet routers, network switches, and fiber-optic cabling in the buildings, among other responsibilities.  Vacancy Announcement at 3.

Between August 20, 2014, and September 10, 2014, candidates applied for the advertised positions by submitting their resumes and answering an online questionnaire about their knowledge, skills, and abilities.  Def.'s SMF ¶¶ 5–6 (¶ 5 disputed as to other facts; ¶ 6 undisputed).  A Human Resources Specialist in AOC's Employment and Classifications Branch reviewed the applications and compiled a list of thirty-five candidates, including the plaintiff, who had applied and were eligible for the GS-11 level position and another list of thirty-four candidates, not including the plaintiff, who had applied and were eligible for the GS-10 level position.  *Id.* ¶ 6.  The two lists had a substantial overlap of candidates.  Def.'s Mot., Ex. 3, Certificates of Eligible Candidates ("Candidate List") at 2–4, ECF No. 16-5.  These lists were forwarded to the selecting official, Scott Bieber, a Caucasian man who is a Supervisory Electronics Technician overseeing the EMCS Branch of the AOC.  Def.'s SMF ¶ 7 (undisputed); Def.'s Mot., Ex. 4, Deposition of Scott Lynn Bieber ("Bieber Dep.") at 4, ECF No. 16-6.  Bieber

---

[3]      The plaintiff testified that he had unsuccessfully applied for this job twice before, but noted that he did not file complaints with the Equal Employment Opportunity Commission related to his nonselection for those openings. Pl.'s Dep. at 51–55, ECF No. 18-2.

reviewed the candidates and selected six, including the plaintiff, to be interviewed by a three-member selection panel.  Def.'s SMF ¶ 9 (disputed as to other facts).  In reviewing the candidates' applications, Bieber created a spreadsheet in which he marked each candidate's experience, including whether the candidate was employed by AOC; whether the candidate had experience with BAS, automated logic controls, network, and HVAC; and whether the candidate had worked with contractors including Alerton and Reliable.  Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n), Ex. 3, Bieber Preinterview Spreadsheet ("Bieber Spreadsheet") at 1–2, ECF No. 18-3.  Bieber testified that he looked only at the candidates' resumes to compile this spreadsheet. Bieber Dep. at 19, ECF No. 16-6.

Bieber asked Clifford Wallace, a Caucasian man who is a GS-12 Electronic Equipment Controls Mechanic in the EMCS Branch, and Terry Watson, a Caucasian woman who is a GS-14 Energy Program Manager within the Planning and Project Management Division, to serve with him on the selection committee.  Def.'s SMF ¶¶ 10–11 (undisputed); Pl.'s Opp'n, Ex. 5, Deposition of Clifford Martin Wallace ("Wallace Dep.") at 4–5, ECF No. 18-5; Def.'s Mot., Ex. 6, Deposition of Terry Watson ("Watson Dep.") at 5–7, ECF No. 16-8.  The plaintiff claims that "[t]ypically, an impartial member from a department outside the vacancy is included on such a selection panel, but Bieber did not include such a person."  Pl.'s Opp'n, Ex. 10, Pl.'s Responses to Def.'s Statement of Material Facts ("Pl.'s SMF") ¶ 9, ECF 18-10.  Bieber compiled a list of interview questions and provided that list in advance to each of the interviewers.  Wallace Dep. at 16–18, ECF No. 16-7.  Some of the questions were general, asking the candidates to describe their "applicable education, training, and experience," their "areas/systems of expertise," and why they wanted to join EMCS, while other questions were more specific, asking about the candidates' knowledge of and experience with "DDC systems and equipment," "BACnet

5

systems and equipment," "DDC networks and network equipment," and "Fiber Optic and Ethernet Cable/Networks."  Def.'s Mot., Ex. 7, Bieber Notes re: Mayorga Interview ("Bieber Notes") at 2–3, ECF No. 16-9.  Watson also asked Bieber to add a question about project management experience, which Bieber agreed to do.  Watson Dep. at 34–35, ECF No. 16-8.

Bieber took the lead in questioning the candidates and read the same questions, verbatim, to each candidate.  Bieber Dep. at 37–38, ECF No. 16-6; Wallace Dep. at 16–21, ECF No. 16-7; Watson Dep. at 17, ECF No. 16-8.  Watson then asked her question about project management.  Watson Dep. at 34–35, ECF No. 16-8.  The panelists would occasionally ask follow-up questions to clarify a candidate's answer, although the plaintiff avers that none of the interviewers asked him any follow-up questions.  *Id.* at 17; Pl.'s SMF at ¶ 13.  According to the plaintiff, Wallace did not ask him any questions during his interview.  Pl.'s Dep. at 82–83, ECF No. 18-2.  When the plaintiff asked Wallace why he had not asked any questions, Wallace told the plaintiff that he was "really doing a good job."  *Id.*  The plaintiff also alleges that during his interview, the interviewers "did not look at him when he spoke and were instead ruffling their papers," although he acknowledges that they were taking notes during the interview.  Pl.'s SMF ¶ 13; Pl.'s Dep. at 83–84, ECF No. 18-2.

After completing the interviews, the panel convened, reviewed their notes from the interviews, and discussed the strengths and weaknesses of each candidate.  Bieber Dep. at 21, ECF No. 16-6.  Bieber testified that in filling the positions, he was looking for "two different skill sets" since he had two positions to fill: he was hoping for one position to be "network related" and for the other to be focused on "graphics and program running jobs, coordinat[ing] with contractors."  *Id.* at 19.  He communicated this desire to the other two members of the selection committee.  *See id.* at 21; Wallace Dep. at 8, ECF No. 16-7; Watson Dep. at 12–13,

ECF No. 18-6.  In response to the plaintiff's question about whether the panel was looking for

project management skills, Wallace stated that they were "[n]ot really" looking for that skill but

"it would help" with the position.  Wallace Dep. at 8, ECF No. 16-7.  Similarly, Watson testified

that, regarding network experience, it would be "a bonus if someone has that particular skill set."

Watson Dep. at 13, ECF No. 18-6.  After reviewing their notes and the candidates' materials, the

committee decided, by consensus, that Ed Williams, John Coulter, and Alan Gantt would go on

to second-round interviews.  Bieber Dep. at 21, ECF No. 16-6; Wallace Dep. at 32–33, ECF No.

16-7; Watson Dep. at 11, ECF No. 16-8.  The members of the panel each testified that Williams

and Coulter, both Caucasian men, occupied the top two positions, while the plaintiff fell toward

the bottom of the list of interviewed candidates.  Bieber Dep. at 21–23, ECF No. 16-6; Wallace

Dep. at 32–33, ECF No. 16-7; Watson Dep. at 11–12, ECF No. 16-8.

Bieber and his supervisor, Doug Helmann, then conducted second-round interviews with

Williams, Coulter, and Gantt.  Def.'s SMF ¶ 15 (disputed as to other facts).  Helmann's

supervisor, Anna Franz, had asked him to meet with the candidates to ensure that he was

comfortable with the panel's recommendation.  *Id.*; Def.'s Mot., Ex. 10, Deposition of Doug

Helmann ("Helmann Dep.") at 13–15, 20–21, ECF No. 16-12.  After Helmann gave his approval

for the selection of Williams and Coulter, the Employment and Classifications Branch

electronically transmitted Bieber's decision to Franz for her concurrence, and those two men

were hired.  Def.'s SMF ¶ 16 (undisputed); Helmann Dep. at 20–21, ECF No. 16-12; Def.'s

Mot., Ex. 12, Deposition of Anna Franz ("Franz Dep.") at 12–13, 29–32, ECF No. 16-14.

According to Bieber, who supervises Williams and Coulter, Williams occupies the position

focused on graphics and programming while Coulter occupies the network-oriented position.

Bieber Dep. at 20, ECF No. 16-6.

On November 28, 2014, the plaintiff learned that he had not been selected for the available positions.  Def.'s SMF ¶ 24 (undisputed); Compl. ¶ 8.  The plaintiff subsequently sought counseling with the AOC's Office of Compliance Certification, which ended without resolution on April 21, 2015.  Def.'s SMF ¶ 24 (undisputed); Def.'s Mot., Ex. 24, Office of Compliance Certification ("Compliance Certification") at 2, ECF No. 16-26.  The plaintiff then sought mediation on May 5, 2015, which ended without resolution on July 6, 2015.  Def.'s SMF ¶ 24 (undisputed).

On October 1, 2015, the plaintiff filed the instant lawsuit, alleging that he was the victim of racial and national origin discrimination when he was passed over for this position.  Compl. ¶ 11.  The plaintiff claims that Bieber "has a long history of preferring employees who, like him, are white and speak without a foreign accent."  Pl.'s Opp'n at 2.  According to the plaintiff, Bieber "has specifically displayed a distaste for Mr. Mayorga's hispanic origin, treating him with disdain and making fun of his hispanic-sounding name by regularly calling him 'caviar,' to his face."  Id. at 2–3.  Bieber also allegedly "mocks and interrupts" the plaintiff when he tries to speak in meetings, "tells him to his face that he needs to speak better English," "laughs at him," and "has passed him over for promotion three times."  Id. at 3.  The plaintiff testified that an HVAC technician at AOC told him that he "better watch your back with" Wallace and Bieber, because "they don't like you."  Pl.'s Dep. at 39–40, ECF No. 18-2.  One of the plaintiff's coworkers, Hector Molina, claims that he heard Williams, Wallace, and AOC employee Mark Parker "disparage Mr. Mayorga because of his Hispanic origin" by "intentionally mispronounc[ing] his name and tell[ing] him he needs to better his English."  Pl.'s Opp'n, Ex. 8, Statement of Hector Molina ("Molina Statement") at 1, ECF No. 18-8.  In their depositions, Bieber, Coulter, Wallace, and Williams all said that they had never heard anyone refer to the

8

plaintiff as "Caviar" and denied that they had made fun of his accent.  Bieber Dep. at 13, ECF
No. 18-1; Deposition of John Coulter ("Coulter Dep.") at 9–10, ECF No. 16-11; Wallace Dep. at
15, ECF No. 16-7; Pl.'s Opp'n, Ex. 4, Deposition of Edward Williams Jr. ("Williams Dep.") at
14–15, ECF No. 18-4.

> ### B.    The Candidates' Qualifications for the Vacant Position

In light of the plaintiff's claim that he "was the most qualified applicant for the position
but was not selected because of his race and national origin," Compl. ¶ 8, Williams's and
Coulter's qualifications are reviewed in some detail.  At the time of his selection, Williams was
already working for Bieber as an Electronic Industrial Controls Mechanic at the WG-12 level
and had been in that position for four years.  Def.'s Mot., Ex. 13, Resume of Edward L. Williams
Jr. ("Williams Resume") at 2, ECF No. 16-15; Bieber Dep. at 7, ECF No. 16-6.  In that role, he
designed and installed graphics and programs for the BASnet system, operated and
troubleshooted the BASnet, tested and troubleshooted fiber-optic cables, operated and monitored
LAN Gate routers and LAN Gate Ethernet routers, designed and installed new networks,
installed Ethernet cabling, and installed new DDC systems, among many other tasks.  Williams
Resume at 2.  Williams also had experience with the AOC's controls systems and equipment
from his work at the Capitol and the Supreme Court.  Williams Dep. at 6–7, ECF No. 16-10.
Bieber's spreadsheet, in which he noted each candidate's experience, indicates that Williams had
experience with BAS, automated logic controls, the contractors Alerton and Reliable, network,
and HVAC.  Bieber Spreadsheet at 2.  Before becoming an Electronic Industrial Controls
Mechanic, Williams worked for ten years as an HVAC Mechanic at the AOC.  Williams Resume
at 2–3.  Williams is a certified fiber-optics installer and has taken numerous courses in automated
logic operation and troubleshooting.  *Id.* at 3.  Williams does not have a college degree.  *Id.*

Bieber testified that Williams was his top choice because "he had been doing the job of the GS-11. He was running the jobs, writing the programs, creating the graphics. Of course, he ran the fiber already previously. He had fiber certifications. He's ran a lot of Ethernet cabling." Bieber Dep. at 14, ECF No. 18-1. According to Bieber, Williams also had project management experience, and when asked if this was a "big reason" that Williams was selected, Bieber said it was. *Id.* at 20. Williams later testified that his project management experience was in flooring, rather than in the field in which he currently works. Williams Dep. at 6, ECF No. 18-4. Wallace testified that Williams "had everything that [they] were looking for. He was fiber certified. He had done multiple projects in building automation." Wallace Dep. at 8–9, ECF No. 16-7. In Wallace's view, they "couldn't ask for more" and "there's no doubt after the interview that he stood out." *Id.* at 34. Watson agreed, testifying that Williams "stood out because he had a fairly detailed resume," "had specific examples," "had good controls knowledge," and "also had HVAC experience." Watson Dep. at 15–16, ECF No. 18-6.

At the time of his selection, Coulter was an Electronics Mechanic with AOC and had worked in that position for approximately four years. Def.'s Mot., Ex. 17, Resume of John C. Coulter ("Coulter Resume") at 2, ECF No. 16-19. In that job, he was responsible for installing, troubleshooting, maintaining, and operating systems including the BASnet, as well as configuring and maintaining Cisco LAN Gate Routers, switches, and hubs. *Id.* He was also responsible for installing, testing, and certifying fiber-optic cables and equipment. *Id.* Before joining AOC, he worked as a Cable Splicing Technician for Verizon Communications for five years. *Id.* He has certificates in Cisco networks, HVAC, electronics, low-voltage electrical work, and fiber-optic installation. *Id.* at 3. Bieber's spreadsheet indicates that Coulter had experience with BAS, network, and HVAC. Bieber Spreadsheet at 2. Coulter's resume indicates

that he attended Anne Arundel Community College, where he studied "Business Management and Computer Networking."  *Id.* at 3.

Bieber testified that Coulter was a top choice because he was, at the time, "maintaining [the] BAS net network infrastructure, so he was doing all the fiber work, help configuring switches, the Cisco switches, installing them, certifying all the fiber."  Bieber Dep. at 8, ECF No. 16-6.  Thus, he fulfilled Bieber's goal of hiring someone with particular experience in networks. *Id.* at 19–20; Wallace Dep. at 33–34, ECF No. 16-7.  In addition, Coulter "had Cisco certifications, courses.  He had experience in programming switches and installing them.  He worked for Verizon prior, so he was certified in fiber, and did all type of fiber work.  He also have [sic] HVAC experience, and he's a low voltage electrician."  Bieber Dep. at 10, ECF No. 16-6.  Wallace was "impressed with his network experience, his low voltage license[ ]."  Wallace Dep. at 56, ECF No. 16-7.  Watson agreed and noted that his "resume was detailed" and "listed specific skill sets," and that "during the interview he had specific examples" of his work. Watson Dep. at 18, ECF No. 16-8.

The plaintiff avers that he was more qualified for this position than either Williams or Coulter.  Compl. ¶ 8.  In his resume, the plaintiff stated he has "extensive background in the design, Installation, commissioning, repair and general maintenance of the Building Automation Systems (BAS)" and that he is "[s]killed in troubleshooting of digital controls."  Pl.'s Resume at 2.  In his then-current position as an Electronic Industrial Controls Mechanic with AOC, he was responsible for checking the BAS server and DDC operation, troubleshooting network communication, training the service department on the BAS, and troubleshooting the BAS.  *Id.* at 2.  His resume also describes his experience as an HVAC service technician with Advance Power Control and TK Services, his experience with Maytag, and his associate's degree in

"Network," as well as his certificates in DDC programming, electric diagrams and schematics, heat pumps, air conditioning, and refrigeration, among others. *Id.* at 3–5. Notably, his resume does not mention fiber-optic cables, Ethernet, or BASnet. Bieber's spreadsheet indicates that the plaintiff's resume reflected experience with BAS and Alerton but does not check the boxes for HVAC and network, despite the fact that the plaintiff's resume states his experience with HVAC and his degree in network. Bieber Spreadsheet at 1; Pl.'s Resume at 3–5.

Bieber later clarified that when he was looking for "network" experience, he meant experience with the BASnet. Bieber Dep. at 11, ECF No. 16-6. He testified that the plaintiff was a lower-ranked candidate in part because he did not have experience with BASnet and did not discuss any such experience on his resume or in his interview. *Id.* Bieber also noted that the plaintiff had said in his interview that he had "very little" experience with fiber work or Ethernet cabling and that he "did not have any Cisco experience." *Id.* According to Bieber, the plaintiff "didn't give any details of any of his past experience" during the interview, and when the interviewers "kept asking him for specifics, he kept saying how he's been trained in that" but "wouldn't give [ ] any examples of his experience with systems or equipment." *Id.* at 13, 28. When asked about the plaintiff's experience with automated logic controls, Bieber noted that the plaintiff did have that experience but that it was not listed on his resume. *Id.* at 19. As for the plaintiff's associate's degree in network, Bieber said that he "d[idn't] even think it came out in the interview." *Id.* at 27.

Wallace and Watson reacted similarly to the plaintiff's materials and interview. Wallace testified that the plaintiff "wouldn't give [them] anything to go on. He would just say I've done that in my past job. I've done that." Wallace Dep. at 13, ECF No. 16-7. In Wallace's view, the plaintiff "didn't stand out" and "compared to the other interviewees he was far down the list."

12

*Id.* at 35.  Compared to Williams and Coulter, the plaintiff "didn't have all the programming graphics, different things on the system that we do, the networking experience, the Cisco experience," and he did not have experience with fiber networks.  *Id.* at 35–37.  Watson agreed, noting that "[t]he answers to the resume was [sic] not very detailed" and that the panelists were "not very successful in getting detail for the questions that were asked."  Watson Dep. at 20, ECF No. 16-8.  According to Watson, "there was just an overall lack of detail on his answers," and when they pressed the plaintiff to clarify, "[i]t wasn't there."  *Id.* at 21.

      **C.**      **BAS versus BASnet**

      In opposition to the defendant's motion, the plaintiff's primary argument is that "there are issues of fact regarding whether the selecting official honestly believed that Mr. Mayorga did not have any BASnet experience."  Pl.'s Opp'n at 13.  When pressed about the plaintiff's experience with BASnet, Bieber noted that all of the interviewees had experience with BAS, but he then clarified that experience with the BAS is not the same as experience with BASnet.  Bieber Dep. at 11, 18, ECF No. 18-1; *see also generally* Bieber Decl.  Bieber explained that each building within the AOC's jurisdiction has an internal BAS that consists of "HVAC, plumbing, lighting, elevators, electrical monitoring, generators, utility metering, garage carbon-monoxide and nitrogen-oxide monitoring, and water fountains."  Bieber Decl. ¶ 3.  Within each building, these systems are connected via sensors, controllers, and routers to form the building's BAS.  *Id.* ¶ 4.  Each building's internal BAS is connected to a network access switch via fiber-optic cable, and the building's access switch is, in turn, connected to routers via an Ethernet cable.  *Id.* ¶ 5.  The connection of the building's system to the systemwide routers is where a building's internal BAS meets the BASnet, a "large, campus-wide infrastructure serving thirty-one buildings and five off-site facilities over 17.5 million square feet."  *Id.*  Thus, while "individual jurisdictions, such as the Capitol, House, and Senate jurisdictions, are responsible for other aspects of the BAS,

13

including the installation, operation, and maintenance of the sensors, controls, and related equipment interfaces," these devices "are not, themselves, the 'BASnet.'"  *Id.* ¶ 7.

Bieber testified that while the plaintiff had experience working on the BAS within his jurisdiction (the Capitol Visitor Center), he did not have experience with the BAS *network*, which is limited to Bieber's office.  Bieber Dep. at 11–12, 18, ECF No. 16-6.  Although Wallace testified that the plaintiff was an "operator" on the "BAS Net system," he also testified that he thought the plaintiff did not have "networking" experience on the BAS.  Wallace Dep. at 11, 37–38, ECF No. 16-7.  The plaintiff disputes this account, claiming that he has worked on the BASnet with Bieber's team and that "[w]hen the BASnet went down, [he] had to work with [Bieber's] subordinates to solve the problem."  Pl.'s Opp'n, Ex. 9, Declaration of Javier Mayorga ("Pl.'s Decl.") ¶ 1, ECF No. 18-9.  He also averred that "[t]o use the BASnet to communicate with other buildings, you have to understand Network," which he learned at Stratford University.  *Id.* ¶ 2.  Bieber testified that he had never worked with the plaintiff and that work on the BASnet was limited to his department.  Bieber Dep. at 12, 23, ECF No. 16-6.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *id.* at 323, while the nonmoving party must present specific

14

facts supported by materials in the record that would be admissible at trial and that could enable

a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477

U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on

summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a

reasonable jury could return a verdict for the nonmoving party'") (quoting *Liberty Lobby*, 477

U.S. at 248); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay

. . . counts for nothing on summary judgment." (internal quotation marks omitted)); FED. R. CIV.

P. 56(c), (e)(2)–(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to

the jury is as much art as science."  *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123

(D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve

genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134

S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed,

and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby*,

477 U.S. at 255).  Courts must avoid making "credibility determinations or weigh[ing] the

evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge."  *Reeves v.

Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (internal quotation marks

omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).  In

addition, for a factual dispute to be "genuine," the nonmoving party must establish more than

"[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477

U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights

Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (internal quotation marks

15

omitted); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e).  If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record."  FED. R. CIV. P. 56(c)(3).

## III.    DISCUSSION

In a case involving no direct evidence of discrimination, the court is guided in its analysis of circumstantial evidence by the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), which also applies to claims under the CAA, *see Fields v. Office of Johnson*, 459 F.3d 1, 15 n.24 (D.C. Cir. 2006).  Under the *McDonnell Douglas* framework, the plaintiff has the burden to establish a *prima facie* case of discrimination by showing that (1) he or she "is a member of a protected class;" (2) he or she "suffered an adverse employment action;" and (3) "the unfavorable action gives rise to an inference of discrimination."  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).  If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions.  *McDonnell Douglas*, 411 U.S. at 802.  If the employer establishes a legitimate, nondiscriminatory reason, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer intentional discrimination . . . from all the evidence."  *Carter v. George Wash. Univ.*, 387 F.3d

16

872, 878 (D.C. Cir. 2004).  Thus, courts "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*" where (1) "an employee has suffered an adverse employment action," and (2) "an employer has asserted a legitimate, non-discriminatory reason for the decision."  *Brady v. Office of Sgt. at Arms, U.S. House of Reps.*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).

Instead, in such a case, the court "must resolve one central question," namely, whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race."  *Id.*  In resolving this central question, courts look to, *inter alia*, "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)."  *Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012) (internal quotation marks omitted).  While the plaintiff need not "submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment," *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (internal quotation marks omitted), the plaintiff must do more than merely state a disagreement with, or disbelief of, the explanation to satisfy the burden of showing that a reasonable jury could find that the employer's asserted reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.

To "support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, [a plaintiff may cite] the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent

or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (citing *Brady*, 520 F.3d at 495 & n.3). To survive summary judgment based solely on evidence of pretext, however, a plaintiff must demonstrate that a "reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason." *Id*. at 1096.

Set against the applicable standards, the defendant's proffered reasons for hiring candidates other than the plaintiff are reviewed before turning to the sufficiency of the plaintiff's pretextual evidence.

### A.    The Defendant's Legitimate, Nondiscriminatory Reasons for Hiring Williams and Coulter over the Plaintiff

The parties do not dispute that the plaintiff suffered an adverse employment action. Whether the plaintiff successfully established the other elements of a *prima facie* case of discrimination is irrelevant because the defendant has offered several legitimate, nondiscriminatory reasons for hiring Williams and Coulter over the plaintiff.

As to Williams, Bieber testified that he was selected over the plaintiff because he was already "running the jobs, writing the programs, [and] creating the graphics"; had already handled Ethernet cabling for EMCS; and had a certification in fiber-optic installation. Bieber Dep. at 14, ECF No. 18-1. In addition, Williams was the only applicant who was an internal EMCS candidate and had experience working with that office. Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 7, ECF No. 16-2. The other interviewers likewise testified that Williams "was fiber certified," "had done multiple projects in building automation," "had good controls knowledge," and "also had HVAC experience." Wallace Dep. at 8–9, ECF No. 16-7; Watson

Dep. at 16, ECF No. 18-6.  In comparison, the plaintiff told the interviewers that he had little

Ethernet experience and little fiber-optic experience.  Bieber Dep. at 11, ECF No. 16-6; Wallace

Dep. at 37, ECF No. 16-7.  Given the interviewers' testimony that they were looking for

someone with experience in Ethernet and fiber-optic cabling, they had legitimate,

nondiscriminatory reasons for selecting Williams over the plaintiff.  *See* Bieber Dep. at 19, ECF

No. 16-6; Wallace Dep. at 8, 37, ECF No.16-7.

      As to Coulter, Bieber stated that he was selected due to his "network experience," "Cisco

certifications," and "experience in programming switches and installing them."  Bieber Dep. at

10, ECF No. 16-6.  Bieber also cited the facts that Coulter had previously worked as a Verizon

technician, had certifications in installing fiber-optic cable, had HVAC experience, was a

certified low-voltage electrician, and had worked with Cisco equipment.  *Id.* at 10–11.  Likewise,

Wallace and Watson testified that they were "impressed with his network experience" and with

the specific examples he was able to give them during his interview.  Wallace Dep. at 56, ECF

No. 16-7; Watson Dep. at 18, ECF No. 16-8.  Unlike Coulter's resume, the plaintiff's resume

does not reflect any experience with fiber-optic cabling or Cisco equipment.  These were

legitimate reasons for selecting Coulter over the plaintiff given the nature of the position.

      The defendant also stated that the plaintiff was not chosen because he "had not provided

a sufficient level of detail about his work experience on his resume or in his answers to interview

questions."  Def.'s Mem. at 8.  All of the interviewers testified about the difficulty of getting

additional details or specific examples from the plaintiff during his interview.  Bieber claimed

that the plaintiff "didn't give any details of any of his past experience."  Bieber Dep. at 13, ECF

No. 16-6.  Wallace stated that while other interviewees "would go into detail of how they used

their tools, what jobs they had done, and different things," the plaintiff was "vague in his

answers," "wouldn't give us anything to go on," and would just say "I've done that in my past job. I've done that." Wallace Dep. at 12–13, 18, 23, ECF No. 16-7. Similarly, Watson averred that the panelists were "not very successful in getting detail for the questions that were asked" and that "there was just an overall lack of detail on his answers." Watson Dep. at 20–21, ECF No. 16-8. In contrast, Williams "answered everything fully," "had a fairly detailed resume," and gave "specific examples" when he answered questions. Wallace Dep. at 34, ECF No. 16-7; Watson Dep. at 15–16, ECF No. 18-6. Similarly, Coulter had a detailed resume that "listed specific skill sets" and "specific projects," and during the interview, Coulter "had specific examples" and "was able to answer the question to [their] satisfaction." Watson Dep. at 18, ECF No. 16-8. These are legitimate, nondiscriminatory reasons for selecting Williams and Coulter over the plaintiff, and accordingly, the defendant's burden on this point is amply met.[4]

## B.    The Plaintiff's Evidence of Pretext

Given the defendant's numerous legitimate, nondiscriminatory reasons for hiring Williams and Coulter over the plaintiff, the Court must determine whether the plaintiff "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-

---

[4]        The defendant stated that another reason why the plaintiff was not selected was because he "confessed during the interview that he was not even aware of which position he had applied for." Def.'s Mem. at 8. According to Bieber, when the plaintiff was asked why he wanted a job in Bieber's department, the plaintiff said he thought he was interviewing for an engineering position in a different branch and that he "didn't realize it was for [Bieber's] shop." Bieber Dep. at 35, ECF No. 16-6. Wallace likewise testified that when the plaintiff "walked in the interview one thing was he said, oh, this is for that job. He says, I thought this was a job in engineering. He said, I didn't mean to apply for this, so." Wallace Dep. at 13, ECF No. 16-7. These assertions stand in stark contrast to the plaintiff's resume and declaration. The plaintiff avers that "[i]t was very clear on the vacancy announcement what the job was" and that he "filled out the form knowing what the job was." Pl.'s Decl. ¶ 3. The plaintiff's resume supports his claim, stating that his objective was to "achieve meaningful employment with the Office of Planning and Project Management as an Electronic Technician," the exact job title listed in the vacancy announcement. Pl.'s Resume at 2; Vacancy Announcement at 1.
        Although the parties dispute each other's version of these events, this is not a genuine dispute as to a material fact. Even taking the plaintiff's set of facts as true, and assuming he knew the position to which he had applied, the outcome of this case remains the same, since, as discussed *infra* at Part III.B, the plaintiff was less qualified than Williams or Coulter and did not carry his burden of establishing that the defendant's other legitimate, nondiscriminatory reasons for hiring Williams and Coulter over him were pretext for discrimination. Nor would Bieber's and Wallace's notes about the plaintiff's confusion, even if misguided, be sufficient proof of discriminatory animus to preclude summary judgment.

discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race." *Brady*, 520 F.3d at 494.  The plaintiff offers one theory to establish pretext: that the selecting official, Bieber, falsely claimed that the plaintiff "had *no* BASnet experience."  Pl.'s Opp'n at 9.  The plaintiff also mentions several additional facts that could be construed as arguments in favor of a finding of pretext: that he was not hired despite his superior qualifications, that Bieber misstated the desired qualifications for the two vacancies, and that his interview was conducted in a manner suggestive of pretext.  Finally, the defendant offers independent evidence of his employer's discriminatory statements and attitudes. For the reasons that follow, none of these arguments is persuasive.

### 1.   *Any Alleged Mischaracterization of the Plaintiff's Qualifications Was Not Indicative of Pretext*

The plaintiff's argument section of his opposition focuses only on the theory that Bieber falsely claimed the plaintiff had no BASnet experience, thereby showing discriminatory bias against the plaintiff.  Pl.'s Opp'n at 9–13.  This argument must be rejected, however, because even if Bieber did misstate the plaintiff's experience, that mistake does not give rise to an inference of discrimination and, in addition, each interviewer cited multiple reasons for why the plaintiff was not selected besides a lack of BASnet experience.

In attacking the defendant's qualifications-based explanation of its hiring decision, the plaintiff "can attempt to show that the employer's explanation was fabricated after the fact" or "can attempt to show that the employer's explanation misstates the candidates' qualifications." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1295 (D.C. Cir. 1998) (en banc).  Thus, for example, "if the employer says that it did not hire the plaintiff because he did not speak Portuguese, the plaintiff can show that he *did* speak Portuguese, and that the employer knew it.  Adequate evidence of this type may suffice to permit a jury to infer that the employer's explanation is

21

incorrect or fabricated, and thus to infer discrimination." *Id.* (emphasis in original).  If the employer made only a "minor mistake of fact on an issue that would not alter the outcome of a decision," however, that mistake "does not render an explanation pretextual."  *Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 155 (D.D.C. 2013); *see also George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.") (internal quotation marks omitted and alterations adopted).

The parties appear to dispute whether the plaintiff did, in fact, have experience with BASnet.  *Compare* Bieber Dep. at 12, ECF No. 16-6 ("As far as working on the actual BAS net network.  No, he does not have experience with that.  That's only limited to my shop."), *with* Pl.'s Decl. ¶ 1 ("I have worked with [Bieber's] team on the BASnet. . . . I work on the BASnet to control the technology in the Capitol building and the Capitol Visitor Center.").  This dispute does not preclude summary judgment, however.  Even if the defendant did mischaracterize the plaintiff's BASnet experience, that potential error alone does not give rise to an inference of discrimination because no evidence in the record suggests that this explanation was anything more than an honest mistake.  *See Warner*, 956 F. Supp. 2d at 155 ("[P]retext is a lie, not merely a mistake.") (quoting *Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000)); *Jarmon v. Genachowski*, 720 F. Supp. 2d 30, 40 (D.D.C. 2010) ("The pertinent question is not whether plaintiff lacked [the relevant] experience, but whether [the employer] 'honestly and reasonably believed' that he lacked it.") (quoting *Brady*, 520 F.3d at 496).

Bieber explained that he believed the plaintiff lacked BASnet experience because the plaintiff did not discuss any BASnet experience during his interview and did not list any BASnet experience on his resume.  Bieber Dep. at 11–12, 18–19, ECF No. 18-1.  He acknowledged the plaintiff's experience with the Capitol Visitor Center's BAS, but he explained that working on the BAS is not the same as working on the BASnet.  Bieber Decl. ¶ 7; Bieber Dep. at 11–12, 18, ECF No. 18-1.  The spreadsheet Bieber created prior to the interviews, based on the candidates' resumes, is consistent with his explanation: The plaintiff's resume makes several mentions of his experience with BAS, and Bieber noted that experience in his spreadsheet under the heading "BAS."  Bieber Spreadsheet at 1.  The plaintiff's resume does not, however, make any reference to the BASnet, and accordingly, Bieber did not note the plaintiff's "network" experience on his spreadsheet because the "network" to which Bieber was referring was the "BASnet."  Bieber Dep. at 11, 18, ECF No. 18-1.  Other than his own disagreement with Bieber's description, the plaintiff has offered no evidence that Bieber fabricated this reasoning—but "the plaintiff must do more than merely state a disagreement with, or disbelief of, the explanation" to satisfy his burden and avoid summary judgment.  *Warner*, 956 F. Supp. 2d at 150.  Unlike the plaintiff in *Jarmon*, the case on which the plaintiff principally relies, the plaintiff has not "raise[d] doubts as to whether that mistake was an honest one."  *Jarmon*, 720 F. Supp. 2d at 40.[5]  Thus, even if Bieber mistakenly concluded that the plaintiff had no BASnet experience, that mistake was only a "minor mistake of fact on an issue that would not alter the outcome of a decision" and does not render the defendant's explanation pretextual.  *Warner*, 956 F. Supp. 2d at 155.

---

[5]    In *Jarmon*, the plaintiff, an African-American male who worked as an auditor at the Federal Communications Commission, unsuccessfully sought a promotion within the Commission.  *Jarmon*, 720 F. Supp. 2d at 32–33.  The selecting official stated that the plaintiff had no experience supervising other auditors, but the plaintiff offered proof that he had more than thirteen years of experience supervising others and his job application "specifically point[ed] to two occasions when as Lead Auditor he supervised three other auditors, and one occasion where he supervised eight accountants."  *Id.* at 40 (internal citation omitted).  The court concluded that, based on this evidence, "[a] reasonable juror could therefore question whether [the employer's] mistake was an honest one."  *Id.*

23

Moreover, even if the plaintiff did have BASnet experience, that fact would not alter the outcome here given the panelists' testimony about other reasons why the plaintiff was not selected.  Bieber testified that the plaintiff was not selected because he had "very little" experience with fiber-optic and Ethernet work and no experience with Cisco, all key components of the advertised position.  Bieber Dep. at 11–12, ECF No. 16-6.  In addition, "based on his interview and his resume he didn't give any particular details," and the panel "had no idea what his skill set was." *Id.* at 23.  Similarly, Wallace testified that the plaintiff was not selected because he "didn't have all the programming graphics, different things on the system that we do, the networking experience, the Cisco experience" and did not have experience with fiber-optic networks.  Wallace Dep. at 35–37, ECF No. 16-7.  The panelists' notes from the plaintiff's interview corroborate this account, each noting that the plaintiff said he lacked fiber-optic experience.  *See* Bieber Notes at 2; Def.'s Mot., Ex. 15, Wallace Notes re: Mayorga Interview ("Wallace Notes") at 2, ECF No. 16-17; Def.'s Mot., Ex. 16, Watson Notes re: Mayorga Interview ("Watson Notes") at 2, ECF No. 16-18.  In contrast, Williams was chosen in part due to his experience with Ethernet and fiber-optic cabling, and Coulter was chosen in part due to his experience with Cisco switches, fiber-optic cabling, HVAC systems, and low-voltage electrical work.  Bieber Dep. at 10, 14, ECF No. 18-1.  The plaintiff does not claim that the defendant was mistaken about his qualifications in these areas.  Thus, even taking the plaintiff's position as true and assuming that he did have BASnet experience, other legitimate, nondiscriminatory reasons explain why the plaintiff was not selected for this position such that any purported mischaracterization about his BASnet experience is not indicative of discrimination.

24

### 2.    *The Plaintiff Was Not Significantly Better Qualified than Williams or Coulter*

The plaintiff claims that he was the most qualified applicant for the position but was not selected because of his race and national origin.  Compl. ¶ 8.  "[W]hen an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was '*significantly better qualified for the job*' than those ultimately chosen." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)) (emphasis in original).  The gap in qualifications must be "great enough to be inherently indicative of discrimination." *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (internal quotation marks and citation omitted).  In cases where the comparative qualifications are close, however, "a reasonable jury would not usually find discrimination because the jury would 'assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.'" *Adeyemi*, 525 F.3d at 1227 (quoting *Aka*, 156 F.3d at 1294).  In such cases, courts must "respect the employer's unfettered discretion to choose among qualified candidates." *Fischbach*, 86 F.3d at 1183.  To conclude otherwise would render the court a "super-personnel department that reexamines an entity's business decisions," a role that courts have repeatedly disclaimed. *Jackson*, 496 F.3d at 707.

The facts of this case indicate that the plaintiff was not better qualified, let alone "*significantly* better qualified," than Williams or Coulter for the available positions.  The interviewers testified that experience with Ethernet, fiber-optic cables, and Cisco equipment is highly relevant to the vacant position. *See* Bieber Dep. at 10–11, 14, ECF No. 18-1; Wallace Dep. at 8–9, 42, 57, ECF Nos. 16-7, 18-5; Watson Dep. at 30–31, ECF No. 16-8; *see also*

25

Vacancy Announcement at 3.  The interviewers also stated, and the plaintiff does not dispute, that the plaintiff told them he had little experience with Ethernet or fiber-optic work and that he had no experience with Cisco.  *See* Bieber Dep. at 11, ECF No. 16-6; Wallace Dep. at 32–33, 35–37, ECF No. 16-7; Bieber Notes at 2; Wallace Notes at 2; Watson Notes at 2.  By contrast, both Williams and Coulter were lauded for their experience with Ethernet and their certifications in fiber-optic work, and Coulter's experience with Cisco equipment was repeatedly mentioned. *See* Bieber Dep. at 8, 10–11, 14, ECF No. 18-1; Wallace Dep. at 8–9, 33–34, 56–57, ECF No. 16-7; Watson Dep. at 30–31, ECF No. 16-8; Williams Resume at 3; Coulter Resume at 3.  On this basis, no reasonable factfinder could conclude that the plaintiff was significantly better qualified for the job than either Williams or Coulter and, accordingly, no inference can be drawn that this choice was "inherently indicative of discrimination."  *Jackson*, 496 F.3d at 707 (internal quotation marks omitted).

### 3.    *Any Misstatements of the Desired Qualifications for the Two Vacancies Are Not Indicative of Pretext*

Next, the plaintiff claims that Bieber misstated the qualifications he was seeking for the vacancies and that this misstatement is evidence of pretext.  Pl.'s Opp'n at 3.  As the D.C. Circuit has repeatedly said, "courts are not super-personnel departments that reexamine an entity's business decisions."  *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003) (internal quotation marks omitted and alterations adopted).  Rather, courts will defer to an employer's decision of what nondiscriminatory qualities it seeks in filling an open position, *see id.*, and "[t]he fact that an employer based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment."  *Jackson*, 496 F.3d at 709.  "The discretion to package certain skills in a single position, as here, remains with the employer,

26

unless it involves an attempt to exclude members of a protected class from gaining access to the position." *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 26 (D.C. Cir. 2013).

Again, the plaintiff's claims do not establish that the defendant's reasons for selecting Williams and Coulter over the plaintiff were pretext for discrimination.  The plaintiff alleges that Bieber's testimony that he wanted one of the selectees to focus on networking and the other to focus on graphics and programming is called into question by Watson's testimony that "network was not among the primary skills the panel was seeking."  Pl.'s Opp'n at 3.  While Watson did testify that having network experience would be "an add on, a bonus if someone has that particular skill set," she also said that networking "would be a skill that is a good skill to have." Watson Dep. at 13, ECF No. 18-6.  Moreover, both Bieber and Wallace emphasized that they were looking for network experience.  Bieber stated that the panel was looking for "two different skill sets," one that was "network related" and another that was "for graphics and program running jobs," Bieber Dep. at 19, 21, ECF No. 16-6, while Wallace testified that they were looking for a technician with "network capability" who was a "network manager type," Wallace Dep. at 8, ECF No. 16-7.  The job description comports with this account, as it discusses installing and maintaining "the AOC Building Automation System Network," "installing new network(s) in the buildings," and installing and testing "Riser and Horizontal Network Cabling (Ethernet cabling)"—all tasks that involve network experience.  Vacancy Announcement at 3. Finally, all of the panelists testified about their views on the comparative network experience of Williams, Coulter, and the plaintiff.  *See* Bieber Dep. at 8, 10–12, ECF No. 16-6; Wallace Dep. at 8–9, 23, 33, 35–37, 56–57, ECF No. 16-7; Watson Dep. at 30–31, ECF No. 16-8.  Contrary to the plaintiff's assertion, network experience was evidently a large consideration in the panel's decision.

27

The plaintiff's claims about project management are no more successful.  The crux of this claim is that while Bieber testified that project management experience was "the 'big reason'" that he selected Williams, Williams in fact did not have any project management experience in electronics or building automation.  Pl.'s Opp'n at 4.  This is a mischaracterization of Bieber's testimony.  In response to plaintiff's counsel's question about whether project management experience was "*a* big reason" that Williams was selected, Bieber responded affirmatively—but he also detailed Williams's other qualifications for the position.  Bieber Dep. at 14, 20, ECF No. 18-1 (emphasis added).  In addition, Wallace testified that they "weren't really looking for" people with project management experience because they "usually had project managers that manage our projects."  Wallace Dep. at 8, ECF No. 16-7.  According to Wallace, project management experience "would help, but it wasn't our goal."  *Id.*  Finally, it is undisputed that Williams did have *some* project management experience, even if that experience was in a different field.  *See* Williams Dep. at 5–6, ECF No. 16-10 (noting that he has project management experience in the private flooring industry).  Taken together, this evidence shows only that different panelists weighed the candidates' various qualities slightly differently and does not raise an inference of discrimination sufficient to overcome summary judgment.

4.    ***The Manner in Which the Plaintiff's Interview Was Conducted Does Not Establish Pretext***

The plaintiff also claims that the way in which his interview was conducted establishes pretext.  In this Circuit, "[a]n employer's failure 'to follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual."  *Fischbach*, 86 F.3d at 1183 (quoting *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982)).  "Even if a plaintiff 'was victimized by poor selection procedures,' we may not 'second-guess an employer's personnel decision absent demonstrably

28

discriminatory motive.'"  *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (quoting *Fischbach*, 86 F.3d at 1183).

The record in this case shows no demonstrably discriminatory motive behind the manner in which the plaintiff's interview was conducted, nor does it support the plaintiff's claim that the defendant eschewed its typical selection process.  The plaintiff first complains that "the panelists appeared disinterested in his candidacy" and "did not look at him when he spoke and were instead shuffling their papers," but he also admits that they were taking notes during the interview and looking down at their printed interview questions.  Pl.'s Opp'n at 3–4; *see also* Pl.'s Dep. at 83–85, ECF No. 18-2.  A lack of eye contact does not evince discriminatory bias, particularly given these circumstances.  The plaintiff also claims that the interviewers did not ask him any follow-up questions and instead "simply wrote question marks or negative comments on their papers," Pl.'s Opp'n at 4, but he testified that when he asked why Wallace had not asked any questions, Wallace told him he was "really doing a good job."  Pl.'s Dep. at 82–83, ECF No. 18-2.  The plaintiff also testified that he felt he had the opportunity to provide answers to all of the interviewers' questions.  *Id.* at 82.  Finally, the plaintiff claims that the selection committee typically includes "an impartial member from a department outside the vacancy" but that no such member was included in his interview.  Pl.'s SMF ¶ 9.  No record evidence supports the existence of such a policy, let alone that the defendant violated the policy due to discriminatory bias.  The plaintiff cannot rely on his own conclusory assertion to avoid summary judgment.  *See Equal Rights Ctr.*, 633 F.3d at 1141 n.3.  Accordingly, none of these facts establishes that the defendant's stated reasons for hiring Williams and Coulter were pretextual.

### 5.    *The Plaintiff's Evidence of Discrimination Does Not Show Pretext*

Finally, the plaintiff offers evidence, in the form of his deposition testimony, his declaration, and the declaration of his coworker, Hector Molina, as additional proof of the

defendant's discriminatory animus toward him.  To avoid summary judgment, the plaintiff bears

the burden of "showing that a reasonable jury could conclude that he had suffered

discrimination." *Aka*, 156 F.3d at 1290.  In doing so, the plaintiff may point to "independent

evidence of discriminatory statements or attitudes on the part of the employer." *Hampton*, 685

F.3d at 1100 (internal quotation marks omitted).  Although a supervisor's single egregious

remark may constitute direct evidence of discrimination entitling a plaintiff to a jury trial, *see*

*Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (supervisor's explicit statement

that he "denied [plaintiff] a raise because of his race" was a sufficient basis to deny summary

judgment), "'[s]tray remarks,' even those made by a supervisor, are insufficient to create a

triable issue of discrimination where . . . they are unrelated to an employment decision involving

the plaintiff." *Perry v. Shinseki*, 783 F. Supp. 2d 125, 138 (D.D.C. 2011) (quoting *Simms v. U.S.*

*Gov't Printing Office*, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000)).

　　　　Here, the plaintiff's evidence of discrimination is primarily found in his own deposition.

In this circuit, "there is no rule of law that the testimony of a discrimination plaintiff, standing

alone, can never make out a case of discrimination that could withstand a summary judgment

motion." *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016) (quoting *Desmond v. Mukasey*,

530 F.3d 944, 964 (D.C. Cir. 2008)).  Nonetheless, "[c]ourts may grant summary judgment to a

defendant where a plaintiff's evidence is vague or conclusory." *Id.*  That is, the plaintiff's

testimony must be "specific and relevant" in order to avoid summary judgment. *Id.* at 711.

　　　　As detailed above, the plaintiff's evidence includes claims that Wallace and two

coworkers, Williams and Parker, mispronounce the plaintiff's name and tell him he needs to

improve his English, and that Bieber has made fun of his accent in the past, treats him with

disdain, calls him "Caviar" to his face, and mocks and interrupts him when he tries to speak in

30

meetings.  *See* Pl.'s Dep. at 37–38, 41–46, 51–55, 78–79, ECF No. 18-2; Pl.'s Opp'n at 2–3, 12.

The plaintiff also alleges that Bieber has passed him over for promotion three times and that

Bieber has never promoted nonwhite individuals during his tenure at AOC.  Pl.'s Opp'n at 2–3.

Preliminarily, any claims about Williams's and Parker's discriminatory acts is irrelevant to the

plaintiff's claim because Williams and Parker played no part in the selection, interviewing, and

hiring process.  *See Sewell v. Chao*, 532 F. Supp. 2d 126, 138 n.8 (D.D.C. 2008) ("Evidence of

discrimination does not include stray remarks in the workplace, particularly those made by

nondecision-makers.") (internal quotation marks omitted).  In addition, the plaintiff has not

pressed any claims about prior attempts at promotion, and therefore only the 2014 promotion is

at issue.  *See generally* Compl.

 The plaintiff's other claims of discriminatory acts are substantially weakened by the fact

that he has offered no evidence or testimony that these acts occurred in relation to the

employment decision at issue.  *See Perry*, 783 F. Supp. 2d at 138.  First, the plaintiff claims that

after the selection, he went to a meeting that Bieber and Watson also attended and that when they

saw him, "they started laughing" and "looking at [him] like, we can do whatever we want."  Pl.'s

Dep. at 78, ECF No. 18-2.  The plaintiff did not ask them why they were laughing and did not

overhear them say anything at all, let alone anything pertaining to him.  *Id.*  Notably, this

instance occurred *after* the selection at issue, and the plaintiff has offered no reason to think that

Bieber and Watson were actually laughing at him.  *Id.* (stating that this incident occurred "after

they already hired the two guys that are working there").  The plaintiff also claims that Bieber

"mocks and interrupts Mr. Mayorga when he tries to speak in meetings," Pl.'s Opp'n at 3, but he

offers only one vague instance of Bieber interrupting him at a meeting, claiming that "[o]ne time

when we got meetings, talking about technology things, so when I tried to talk, so as soon I tried

to open my mouth, he tried to interrupt me, interrupt me and talk about something else, like

avoiding my opinion.  When I talk he start smiling because I'm funny, funny way."  Pl.'s Dep. at

37, ECF No. 18-2.  Again, there is no indication that this is a habitual occurrence and no

evidence that this incident occurred in relation to the selection at issue.  The plaintiff's retelling

of these events does not, on its own, give rise to an inference of discrimination.  *See Warner*, 956

F. Supp. 2d at 156 (rejecting the plaintiff's claims of discrimination based on an isolated incident

in part because "the plaintiff's interpretation of the statement as discriminatory is not self-

evident").  In fact, the plaintiff provided reason to think that Bieber's interruptions may even

have been well-intentioned: the plaintiff stated that he "has such a heavy accent that the court

reporter for his deposition" had to interject twenty-seven times to clarify his statements.  Pl.'s

Opp'n at 4 n.1; Pl.'s SMF ¶ 13.

　　　　As for the plaintiff's claims that people tell him he needs to improve his English and that

they mispronounce his name by calling him "Caviar," he has again offered no proof or details of

specific instances other than his own vague testimony and an equally vague, unsworn statement

by his coworker Hector Molina.  *See* Molina Statement at 1.  The plaintiff's Memorandum in

Opposition claims that Bieber is the one who deliberately mispronounces his name, but the

plaintiff's testimony seems to indicate that it is Wallace and Parker that call him "Caviar."  Pl.'s

Opp'n at 2–3; Pl.'s Dep. at 45–46, ECF No. 18-2.  The only details the plaintiff provided about

when and how often this behavior takes place was that they say it "all the time, all the time."

Pl.'s Dep. at 46, ECF No. 18-2.  This statement offers no details about any relation to the adverse

employment decision at issue and is too vague and conclusory to avoid summary judgment on its

own.  *See Johnson*, 823 F.3d at 710.  Moreover, when asked in their depositions, Bieber, Coulter,

Wallace, and Williams all said that they had never called the plaintiff "Caviar" and that they had

never heard anyone else call him "Caviar."  *See* Bieber Dep. at 13, ECF No. 18-1; Coulter Dep.

at 9–10, ECF No. 16-11; Wallace Dep. at 15, ECF No. 16-7; Williams Dep. at 14, ECF No. 18-4.

Finally, as to the plaintiff's assertion that Bieber "has never hired or promoted a non-caucasian

or anyone who was born outside of the United States," Pl.'s Opp'n at 2, the plaintiff omits the

necessary context that Bieber has made only two hires in his career other than the positions at

issue in this case.  *See* Bieber Dep. at 39–44, ECF No. 20-1.  Without more evidence, this history

does not give rise to an inference of discriminatory intent.

## IV.   CONCLUSION

For the foregoing reasons, the defendant's Motion for Summary Judgment is GRANTED

as the plaintiff has not established that the defendant's legitimate, nondiscriminatory reasons for

hiring Williams and Coulter over the plaintiff were pretext for discrimination.  An appropriate

Order accompanies this Memorandum Opinion.

Date: December 7, 2017

_____
BERYL A. HOWELL
Chief Judge

33

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAVIER A. MAYORGA,

        Plaintiff,

        v.

STEPHEN T. AYERS,
ARCHITECT OF THE CAPITOL,

        Defendant.

Civil Action No. 15-1604 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM AND ORDER

Upon consideration of the plaintiff Javier A. Mayorga's Motion for Reconsideration of Summary Judgment ("Pl.'s Mot."), ECF No. 24, the memoranda submitted in support and opposition, and the entire record herein, for the reasons set out below, the plaintiff's motion is DENIED.[1]

The plaintiff, a Hispanic man of Nicaraguan origin, initiated this action against his employer, the Architect of the Capitol ("AOC"), alleging employment discrimination on the basis of race and national origin in violation of Title IV of the Congressional Accountability Act of 1995 ("CAA"), 2 U.S.C. §§ 1311, 1317(a)(1), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 200e *et seq.* Complaint, ECF No. 1 ("Compl.") ¶ 1.[2] As detailed in the Memorandum Opinion on summary judgment, in the summer of 2014, the plaintiff applied for a promotion within AOC, but two Caucasian individuals were selected over him. *See Mayorga v. Ayers*, No. 15-1604, 2017 WL 6209824, at *1 (D.D.C. Dec. 7, 2017). Although the defendant

---

[1] The plaintiff did not file a timely reply in support of the motion for reconsideration.
[2] The CAA makes Title VII of the Civil Rights Act applicable to the legislative branch of the federal government. *See* 2 U.S.C. § 1302(a)(2).

1

offered numerous legitimate, nondiscriminatory reasons for hiring these two individuals—John

Coulter and Edward Williams—over the plaintiff, the plaintiff averred that those reasons were

pretext for discrimination because, as relevant to the pending motion, the selecting official, Scott

Bieber, misrepresented the plaintiff's qualifications and experience with the Building Automation

System Network ("BASnet").  *See id.* at *9–11; Pl.'s Mot. at 2–3.[3]  On December 7, 2017, this

Court granted summary judgment to the defendant, concluding that any alleged misstatement of

the plaintiff's qualifications did not give rise to an inference of discrimination and that several

other nondiscriminatory reasons, besides BASnet experience or lack thereof, explained why the

plaintiff was not selected for the position.  *Mayorga*, 2017 WL 6209824 at *8–15.

The plaintiff now seeks reconsideration of that decision, claiming that this Court did not

consider the sworn declaration of Clinton Johnson; that the plaintiff's job "application and his

testimony, when considered in the light most favorable to the plaintiff, demonstrate that the

decisionmaker knew, or should have known, that he had experience with Building Automation

System network"; and that "the Johnson declaration and Mr. Mayorga's application, when

considered with the totality of the evidence, raises an inference that the decisionmaker testified

dishonestly about his reasons for denying Mr. Mayorga a promotion."  Pl.'s Mot. at 1.

The plaintiff has cited no legal authority under which he seeks reconsideration of the

Memorandum Opinion on summary judgment.  Such motions may be raised under either Federal

Rule of Civil Procedure 59(e) or 60(b).  A motion for reconsideration under Rule 59(e) is "not

simply an opportunity to reargue facts and theories upon which a court has already ruled," *Fresh*

---

[3]       As explained in the Memorandum Opinion, experience with a building's internal building automation system ("BAS") is not equivalent to experience with the BASnet.  *See Mayorga*, 2017 WL 6209824 at *6.  While each building within AOC's jurisdiction has an internal BAS that consists of heating, ventilation, and air conditioning ("HVAC") maintenance; plumbing; lighting; electrical monitoring; and other maintenance functions, these building-level systems are wired together via Ethernet and fiber-optic cables to create the BASnet, a larger, campus-wide infrastructure.  *See id.*

*Kist Produce, LLC v. Choi Corp.*, 251 F. Supp. 2d 138, 140 (D.D.C. 2003) (quoting *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995)), nor is it a "vehicle to present a new legal theory that was available prior to judgment," *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012) (citing *Fox v. Am. Airlines, Inc.*, 389 F.3d 1291, 1296 (D.C. Cir. 2004)). Instead, a "Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Fox*, 389 F.3d at 1296 (citing *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam)); *see also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 17 (D.C. Cir. 2015) (quoting *Patton Boggs*, 683 F.3d at 403)).

Similarly, "Rule 60(b) allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances including fraud, mistake, and newly discovered evidence." *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005). The party seeking relief under Rule 60(b) bears the burden of proof to show that he is entitled to such relief. *See Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383–84 (1992); *Manhattan Ctr. Studios, Inc. v. NLRB*, 452 F.3d 813, 817 n.6 (D.C. Cir. 2006). A "threshold requirement for obtaining relief under Rule 60(b)" is the demonstration of "a meritorious claim or defense to the motion upon which the district court dismissed the complaint." *Murray v. District of Columbia*, 52 F.3d 353, 355 (D.C. Cir. 1995) (internal quotation marks omitted). The D.C. Circuit has made clear that "[a] meritorious defense is not measured by '[l]ikelihood of success,' but by whether it 'contain[s] even a hint of a suggestion which, proven at trial, would constitute a complete defense.'" *Marino v. DEA*, 685 F.3d 1076, 1080 (D.C. Cir. 2012) (quoting *Keegel v. Key West & Caribbean*

3

*Trading Co.*, 627 F.2d 372, 374 (D.C. Cir. 1980)) (alterations in original; some internal quotation marks omitted).

The plaintiff has not cited a change in controlling law, newly discovered evidence, or fraud. Rather, he claims that the Court ignored the two-paragraph declaration of Clinton Johnson, one of the plaintiff's coworkers, who averred that the plaintiff was the "go to guy" and the "most knowledgable [sic] person in Controls and on the BAS network." Pl.'s Notice of Filing, Ex. 1, Decl. of Clinton Johnson ("Johnson Decl.") at 1, ECF No. 19-1. This brief declaration, which was considered but not cited in addressing the Motion for Summary Judgment, does not mention the difference between the internal building automation system ("BAS") and the BASnet, does not provide details of the declarant's work with the plaintiff, and does not explain the particular tasks the plaintiff undertook regarding the BASnet. Instead, the declaration references only generally "Electronic Controls" and "problems" that the plaintiff had solved. *Id.* Johnson also stated that he turns to the plaintiff when "[he] need[s] to do anything that has to do with Building Automation Systems," *id.*, but this statement mentions only the BAS, not the BASnet, and does not describe in any detail the tasks with which the plaintiff assisted. The declaration thus contributes nothing to establishing that the plaintiff was well-versed with the BASnet or that Bieber's statements about the plaintiff's experience were anything more than an honest mistake.

The plaintiff also offers, as evidence in support of his motion, his resume; application for promotion; college transcript; answers to questions about his knowledge, skills, and abilities ("KSA questions"); and the list of questions asked during the interview. *See* Pl.'s Mot., Ex. 2, Resume of Javier A. Mayorga & All Applicant Data Report ("Pl.'s Resume & KSA Responses"), ECF No. 24-2; Pl.'s Mot., Ex. 3, Vacancy Questions Preview ("KSA Questions"), ECF No. 24-3.

None of these exhibits warrants granting the plaintiff's motion. The plaintiff's resume was offered by both parties in their briefing on summary judgment and mentions only "Building Automation Systems," rather than the BASnet. *See* Pl.'s Resume & KSA Responses at 1; *Mayorga*, 2017 WL 6209824 at *5–6, *10. Bieber's initial assessment of the candidates' qualifications relied on only their resumes, thus explaining his belief that the plaintiff lacked experience with the BASnet. *See Mayorga*, 2017 WL 6209824 at *2, *10. In addition, the plaintiff's answers to the KSA questions—introduced for the first time in support of this motion—indicate familiarity with "Building Automation Controls software" and "systems networks" without specifically mentioning the BASnet. Pl.'s Resume & KSA Responses at 10– 11. This evidence supports, rather than weakens, the conclusion that any misrepresentation of the plaintiff's qualifications was, at most, an honest mistake rather than pretext for discrimination.

Finally, the plaintiff's motion fails to acknowledge the conclusion that even if Bieber had been mistaken about the plaintiff's BASnet experience, several other legitimate, nondiscriminatory reasons explain why the plaintiff was not selected for the available positions. *See Mayorga*, 2017 WL 6209824 at *11–12. While the plaintiff continues to argue that "Bieber's failure to acknowledge his BASnet experience" was pretext for discrimination, Pl.'s Mot. at 4, the plaintiff also acknowledges that "of the ten questions Defendant asked applicants regarding their qualifications, only one pertained to Building Automation networks," *id.* at 3. As detailed in the Memorandum Opinion, the interviewers each offered numerous reasons, beyond BASnet experience or lack thereof, why Coulter and Williams were selected over the plaintiff, focusing on the latter's admitted lack of experience with fiber-optic work, Ethernet work, and Cisco equipment. *See Mayorga*, 2017 WL 6209824 at *11. In contrast to the plaintiff, Coulter

and Williams had extensive experience with Ethernet and fiber-optic cabling, and Coulter also had a history of working with Cisco switches and was certified in low-voltage electrical work. *Id.* The plaintiff ignores these disparities in his motion and has not established that these other legitimate, nondiscriminatory reasons were pretext for discrimination. Accordingly, it is hereby

    **ORDERED** that the plaintiff's motion is DENIED.

    **SO ORDERED.**

*This is a final and appealable order.*

Date: January 30, 2018

_____
BERYL A. HOWELL
Chief Judge